## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| Chad Tyson and Rana Tyson, | § | |
| Plaintiffs, | § | |
| | § | CASE NO. 5:21-cv-01166 |
| | § | |
| v. | § | |
| | § | |
| Equifax Information Services, LLC; | § | |
| Experian Information Solutions, Inc.; | § | |
| Bank of America, N.A.; and DOES 1 | § | |
| through 100 inclusive, | § | |
| Defendants. | § | |

COMES NOW Plaintiff **CHAD TYSON** ("Mr. Tyson") and Plaintiff **RANA TYSON** ("Mrs. Tyson") (collectively, the "Plaintiffs"), both individuals, based on information and belief, to allege as follows:

### INTRODUCTION

1.      This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiffs seek redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiffs' debt.

2.      Defendant Bank of America, N.A. ("BOA") is not reporting Plaintiffs' account accurately as paid as agreed and transferred.

3.      The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

4.      Creditors intentionally and routinely ignore both industry standards and FCRA requirements for accurately reporting debt information. Creditors know that deviating from recognized credit reporting standards and FCRA requirements will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

5.      This was not the intent of Congress when it enacted the Fair Credit Reporting Act.

**JURISDICTION & VENUE**

6.      Plaintiffs re-allege and incorporate the allegations in each and every paragraph above by reference as if fully stated herein.

7.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

8.      This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

9.      Plaintiffs allege that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each of the named Defendants conducts sufficient business within the forum state and this Court has personal jurisdiction over each Defendant under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

**GENERAL ALLEGATIONS**

10.     Plaintiffs alleges that their BOA account was at all times paid on time and as agreed until it was transferred to another lender in or about January of 2019.

11.     Plaintiffs allege that while they did file a Chapter 13 bankruptcy on May 9, 2016, their case was dismissed without discharge in November of 2019, and thus the BOA account was not discharged in their bankruptcy.

12.     Plaintiffs allege they made all payments to BOA on time, as agreed.

13.     Plaintiffs allege that their debt as owed to BOA is fully satisfied and not discharged in bankruptcy.

14.     Plaintiffs allege that it is patently incorrect and misleading for an account which is subject to a dismissed bankruptcy to inaccurately and incompletely reflect the payment history made on the account.

15.     Plaintiffs allege that it is patently incorrect and misleading for a debt which was fully satisfied and transferred to be reported on a credit report as if the debt was discharged in bankruptcy.

16.     Plaintiffs allege that each and every Defendant is familiar with FCRA requirements and subscribes thereto.

17.     Plaintiffs allege that each and every Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

18.     Plaintiffs allege that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine Plaintiffs' ability to repair their respective FICO Scores.

19.     In the alternative, Plaintiffs allege that each and every Defendants' actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

20.     Plaintiffs re-allege and incorporate the allegations in each and every paragraph above by reference as if fully stated herein.

**A.      FICO, Inc.**

21.     FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

22.     The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions. [1]

23.     A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

24.     Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

25.     Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

26.     There are twenty-eight (28) FICO Scores that are commonly used by lenders.

27.     A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. *See https://www.myfico.com* (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score".

28.     The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

29.     FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

30.     A credit entry is a tradeline which represents "each revolving and installment credit account that [consumers] have, there's a tradeline for it on [the] credit report. Revolving tradelines include credit cards and lines of credit, while installment tradelines include loans, such as mortgages, auto loans, student loans and personal loans."[2] Thus, an individual's credit report is made up of multiple tradelines from the consumer's different revolving or installment accounts.

31.     There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

32.     Each of the five (5) factors is weighted differently by FICO.

33.     In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

34.     Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

35.     In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

36.     Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

37.     FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

---

[2] *See* https://www.experian.com/blogs/ask-experian/what-are-tradelines/#s1

38.     A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money."[3] If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". [4]

39.     Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models. These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score".

**B.     Metro 2**

40.     The Consumer Data Industry Association ("CDIA") is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening, and collection services industries.

41.     The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by CDIA to universally report debts in a particular manner.

42.     The CDIA's Metro 2 format is the credit reporting industry standard for credit reporting. While CDIA's Metro 2 format is intended to standardize credit reporting, this standard is still subject to the FCRA's requirement of *maximum possible accuracy and completeness.* [5]

43.     The credit reporting industry at large depends upon the Metro 2 format and the CDIA's recommendations for reporting debt.

---

[3] *See https://www.myfico.com/credit-education/what-is-a-fico-score.*
[4] *See id.*
[5] *Wilson v. Equifax Info. Servs.*, Case No. 2:19-cv-00055-RFB-NJK (D. Nev. 2020) (The CDIA publishes the Metro 2 "reporting standards to assist furnishers with their compliance requirements under the FCRA.").

44.     The CDIA is experienced in credit reporting. In support of this allegation, Plaintiffs aver the following:

a.     The CDIA offers a FCRA certificate program for all CRAs.

b.     The CDIA offers a FCRA awareness program for all CRAs.

c.     The CDIA offers a FCRA certificate program for DFs.

d.     The CDIA offers a FCRA awareness program for DFs.

e.     The CDIA offers a Metro 2 learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 format as well as the relationship between multiple fields.

f.     The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and TransUnion.

g.     The CDIA developed a credit reporting resource guide for reporting credit.

45.     The CDIA's Metro 2 format is accepted by all CRAs.

46.     The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide ("CRRG").

47.     The CRRG outlines the industry standards for reporting debts using Metro 2 format.

48.     The CRRG is not readily available to the public. It can be purchased for $229.45.

49.     Even if a buyer is ready, willing, and able to pay for the CRRG, the CDIA will not grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

50.     When FICO calculates credit scores, the algorithms use Metro 2 information based on industry standards established by the CDIA.

51.     The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

52.     If the Metro 2 data received by FICO deviates from the FCRA requirements or industry standards, an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower, a consumer will be considered a higher credit risk resulting in less favorable lending terms.

### C.     e-OSCAR

53.     e-OSCAR is the web-based, Metro 2 compliant system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

54.     When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

55.     The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g., "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

56.     When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

57.     When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

58.     For clarification, an AUD, or other regular transmission, is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

### D.     Mr. Tyson's Credit Report Contains Inaccurate Adverse Tradelines, which He Disputed to no Avail

59.     On February 9, 2021, Mr. Tyson ordered a three-bureau credit report from Experian to ensure proper reporting by his creditors (the "February 9 Credit Reports").

60.     Mr. Tyson noticed adverse tradelines in his February 9 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with FCRA standards.

61.     Mr. Tyson then disputed the inaccurate tradelines regarding the BOA account via certified mail to Experian and Equifax on or about March 19, 2021 (the "First Mr. Tyson Dispute Letters").

62.     The First Mr. Tyson Dispute Letters specifically put BOA on notice that the bankruptcy was dismissed and the account was not discharged, that the account was reporting with incorrect payment history, and that all payments had been made on time. The dispute also requested bankruptcy information be removed and included the last six months of payment history for verification.

63. The First Mr. Tyson Dispute Letters also detailed what was perceived to be problematic about the account.

64. Mr. Tyson requested that any derogatory reporting be updated to ensure accuracy and completeness of the accounts as required by the FCRA.

65. Mr. Tyson is informed and believes that Experian and Equifax each received the First Mr. Tyson Dispute Letters and, in response, sent Mr. Tyson's disputes to BOA, as the data furnisher, via an ACDV through e-OSCAR.

66. On May 3, 2021, Mr. Tyson ordered a second three-bureau credit report from Experian to determine if his accounts were updated (the "May 3 Credit Reports").

67. Mr. Tyson noticed adverse tradelines in his May 3 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with FCRA standards.

68. Mr. Tyson then re-disputed the inaccurate tradelines regarding the BOA account via certified mail to Experian, Equifax, and TransUnion on or about May 20, 2021 (the "Second Mr. Tyson Dispute Letters").

69. The Second Mr. Tyson Dispute Letters specifically put BOA on additional notice that his Chapter 13 bankruptcy was dismissed without discharge, the account was in good standing at the time of filing bankruptcy, paid at all times during the bankruptcy, and was current when it was assigned to another lender. The dispute also requested bankruptcy information be removed and included the last six months of payment history for verification.

70. The Second Mr. Tyson Dispute Letters also detailed what was perceived to be problematic about the account.

71. Mr. Tyson requested that any derogatory reporting be updated to ensure accuracy and completeness of the accounts as required by the FCRA.

72. Mr. Tyson is informed and believes that Experian, Equifax, and TransUnion each received the Second Mr. Tyson Dispute Letters and, in response, sent Mr. Tyson's dispute to BOA, as the data furnisher, via an ACDV through e-OSCAR.

73. On September 28, 2021, Mr. Tyson ordered a third three-bureau credit report from Experian to determine if his accounts were updated.

**E.    Mrs. Tyson's Credit Report Contains Inaccurate Adverse Tradelines, which She Disputed to no Avail**

74.     On February 9, 2021, Mrs. Tyson ordered a three-bureau credit report from Experian to ensure proper reporting by her creditors (the "February 9 Credit Reports").

75.     Mrs. Tyson noticed adverse tradelines in her February 9 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with FCRA standards.

76.     Mrs. Tyson then disputed the inaccurate tradelines regarding the BOA account via certified mail to Experian on or about March 19, 2021 (the "First Mrs. Tyson Dispute Letters").

77.     The First Mrs. Tyson Dispute Letters specifically put BOA on notice that the bankruptcy was dismissed and the account was not discharged, that the account was reporting with incorrect payment history, and that all payments had been made on time. The dispute also requested bankruptcy information be removed and included the last six months of payment history for verification.

78.     The First Mrs. Tyson Dispute Letters also detailed what was perceived to be problematic about the account.

79.     Mrs. Tyson requested that any derogatory reporting be updated to ensure accuracy and completeness of the accounts as required by the FCRA.

80.     Mrs. Tyson is informed and believes that Experian received the First Mrs. Tyson Dispute Letters and, in response, sent Mrs. Tyson's disputes to BOA, as the data furnisher, via an ACDV through e-OSCAR.

81.     On May 3, 2021, Mrs. Tyson ordered a second three-bureau credit report from Experian to determine if her accounts were updated (the "May 3 Credit Reports").

82.     Mrs. Tyson noticed adverse tradelines in her May 3 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with FCRA standards.

83.     Mrs. Tyson then re-disputed the inaccurate tradelines regarding the BOA account via certified mail to Experian, Equifax, and TransUnion on or about May 20, 2021 (the "Second Mrs. Tyson Dispute Letters").

84.     The Second Mrs. Tyson Dispute Letters specifically put BOA on additional notice that her Chapter 13 bankruptcy was dismissed without discharge, the account was in good standing at the time of filing bankruptcy, paid at all times during the bankruptcy, and was current when it was assigned to another lender. The dispute also requested bankruptcy information be removed and included the last six months of payment history for verification.

85.    The Second Mrs. Tyson Dispute Letters also detailed what was perceived to be problematic about the account.

86.    Mrs. Tyson requested that any derogatory reporting be updated to ensure accuracy and completeness of the accounts as required by the FCRA.

87.    Mrs. Tyson is informed and believes that Experian, Equifax, and TransUnion each received the Second Mrs. Tyson Dispute Letters and, in response, sent Mrs. Tyson's dispute to BOA, as the data furnisher, via an ACDV through e-OSCAR.

88.    On September 28, 2021, Mrs. Tyson ordered a third three-bureau credit report from Experian to determine if her accounts were updated.

   a.    **Inaccuracy – BOA**

89.    Despite actual knowledge, BOA continued to report Mr. Tyson's account, beginning in 166178XXX, to Equifax with a current payment status of "Included in Chapter 13", a comment of "Account involved in chapter 13 debt adj", and without any payment history.

90.    Despite actual knowledge, BOA continued to report Mr. Tyson's account, beginning in 166178XXX, to Experian with a current payment status of "Debt included in or discharged through Bankruptcy Chapter 13", without any payment history from June of 2016 through October of 2018, and with an erroneous "BK" in the payment history for the month of November 2018.

91.    Despite actual knowledge, BOA continued to report Mrs. Tyson's account, beginning in 166178XXX, to Equifax with a current payment status of "Included in Chapter 13", a comment of "Account involved in chapter 13 debt adj", and without any payment history.

92.    Despite actual knowledge, BOA continued to report Mrs. Tyson's account, beginning in 166178XXX, to Experian with a current payment status of "Debt included in or discharged through Bankruptcy Chapter 13", with an erroneous "BK" in the payment history for the month of June of 2016, and without any payment history since June of 2016.

93.    Despite receiving a total of nine (9) disputes, Plaintiffs allege that BOA did not investigate whether Plaintiffs' bankruptcy was dismissed without discharge, whether the account was at all times paid on time, or whether its reporting was correct.

94.    BOA did not update the tradelines to reflect that Plaintiffs' account was not discharged in bankruptcy, was at all times paid on time, and was fully satisfied as to BOA at the time BOA transferred the account.

95. Experian, Equifax, and TransUnion all provided notice to BOA that Plaintiffs were disputing the inaccurate and misleading information, but BOA failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

96. The most basic investigation would include a simple review of internal documentation on the account (i.e., the fact the account was not discharged but was paid and fully satisfied) compared to its reporting in order to determine if it complies with the maximum possible accuracy and completeness standard of the FCRA.

97. Plaintiffs allege that BOA did not review if its reporting complied with the unambiguous language of the FCRA or regulatory guidelines on accurate reporting under the FCRA.

98. If BOA reviewed such standards, or its own internal records regarding Plaintiffs' account, BOA would have seen that its reporting was not in compliance and was therefore inaccurate or incomplete.

99. BOA should have updated each tradeline to CII to Metro 2 Code "Q" to reflect that Plaintiffs' Chapter 13 bankruptcy was dismissed.

100. By reporting Plaintiffs' account as if it was discharged in bankruptcy, it appears to third parties viewing Plaintiffs' credit reports that the account was not paid as agreed and fully satisfied but was instead discharged, which is patently incorrect.

101. Further, as BOA's inaccurate reporting is being used to calculate Plaintiffs' respective Credit Scores, the Credit Scores alone being what most lenders and employers use to determine Plaintiffs' respective creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

102. Discharged debts are far more injurious to a Credit Score or creditworthiness than a satisfied debt. As payment history (including payment status) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect payment status, payment history, and bankruptcy references reported by BOA are lowering Plaintiffs' respective Credit Scores, which adversely affects Plaintiffs' ability to obtain credit.

103. The lack of investigation and reporting of inaccurate and incomplete information by BOA is unreasonable.

**F.      Damages**

104.    Plaintiffs pulled the credit reports at issue at a cost for access to the report, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

105.    As a result of the incorrect reporting, Plaintiffs have incurred out-of-pocket expenses, and has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Fair Credit Reporting Act and the power of this Court to preserve their right to a complete and accurate credit report.

106.    Plaintiffs have been denied credit and are unable to rebuild their credit based on the inaccurate reporting by BOA.

107.    Plaintiffs' respective low credit scores, resulting from BOA's inaccurate reporting, has caused Plaintiffs' to abandon their intentions to apply for certain credit.

108.    BOA actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681.

**FIRST CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))**

**(Against Defendants and Does 1-100)**

109.    Plaintiffs re-allege and incorporate the allegations in each and every paragraph above by reference as if fully stated herein.

**A.      Experian and Equifax Each Failed to Assure Credit Reporting Accuracy**

110.    Experian and Equifax (collectively, the "CRA Defendants") each violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiffs' credit reports and the credit files it published and maintained concerning Plaintiffs.

111.    Had Equifax maintained reasonable procedures to assure maximum accuracy, it would have never reported the BOA account as described herein.

112.    Equifax knew, or should have known, (1) that Plaintiffs' bankruptcy was dismissed without discharge, (2) that the BOA account was at all times paid and fully satisfied, and (3) that the account should not have been reported with any bankruptcy notations as the bankruptcy was dismissed and the debt was paid and transferred. Further, Equifax knew, or should have known, that this inaccurate and incomplete tradeline does not reflect maximum possible accuracy and completeness as required by the FCRA.

113.    Experian knew, or should have known, (1) that Plaintiffs' bankruptcy was dismissed without discharge, (2) that the BOA account was at all times paid and fully satisfied, and (3) that the account should not have been reported with any bankruptcy notations as the bankruptcy was dismissed and the debt was paid and transferred. Further, Experian knew, or should have known, that this inaccurate and incomplete tradeline does not reflect maximum possible accuracy and completeness as required by the FCRA.

114.    Congress specifically recognized the "elaborate mechanism developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character, and general reputation of consumers."[6] The investigation and evaluation of Plaintiff's credit worthiness, credit standing, credit capacity, character and general reputation as a consumer are all damaged by the inaccurate reporting Equifax and Experian each allowed.

115.    As a result of the CRA Defendants' violations of 15 U.S.C. § 1681e(b), Plaintiffs suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit and other mental and emotional distress.

**B.      Willful Violations**

116.    The CRA Defendants' violations, as described herein, were willful; specifically, the CRA Defendants have intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

117.    The CRA Defendants regularly, as a policy, ignore disputes by consumers and fail to perform even a basic investigation regarding the disputes. Additionally, the CRA Defendants regularly fail to forward disputes to data furnishers, thereby frustrating the entire dispute process.

118.    To the extent the CRA Defendants do send consumer disputes, they send these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

119.    The CRA Defendants' employees receive little to no training concerning how to accurately report consumer debt.

120.    Instead, the CRA Defendants' employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

---

[6] *Nayab v. Capital One Bank (USA), NA*, 942 F. 3d 480, 492 (9th Cir. 2019).

121.    The CRA Defendants' employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

122.    The CRA Defendants have intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

123.    As a result of the CRA Defendants' violations of 15 U.S.C. § 1681e(b), Plaintiffs suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

124.    The CRA Defendants' violations were willful, rendering each individually liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

125.    In the alternative, the CRA Defendants were each negligent, which entitles Plaintiffs to recover under 15 U.S.C. § 1681o.

126.    Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorneys' fees from the CRA Defendants in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION
### (Violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1))
### (Against Defendants and Does 1-100)

127.    Plaintiffs re-allege and incorporate the allegations in each and every paragraph above by reference as if fully stated herein.

**A.      BOA Failed to Reinvestigate Following Plaintiff's Dispute**

128.    Pursuant to 15 U.S.C. §§ 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

129.    After receiving notice of the bankruptcy, BOA sent an AUD to the Credit Reporting Agencies reporting Plaintiffs' account as included in Chapter 13 bankruptcy.

130.    Despite the fact Plaintiffs' account was in good standing at the time of the bankruptcy filing and continued to be paid as agreed each month, BOA deleted the entire payment history on Mr. Tyson's and Mrs. Tyson's respective Equifax reports.

131.    BOA reported a "BK" in the payment history for June of 2016 on Mrs. Tyson's Experian report and reported a "D" for no data in the payment history for July 2016 through December 2016.

132.    BOA reported a "D" for no data in the payment history for June 2016 through October of 2018 on Mr. Tyson's Experian report, and reported a "BK" in the payment history for November 2018.

133.    After receiving notice that the bankruptcy was dismissed without a discharge, BOA did not correct the payment history to reflect all the positive payments made from June 2016 through January of 2019, nor did BOA remove the bankruptcy payment status, comments, or payment history notations.

134.    After the account was transferred and fully satisfied in or about January of 2019, BOA continued to report the account to Experian, Equifax, and TransUnion as described hereinabove.

135.    After receiving the Mr. Tyson First Dispute Letters and Mrs. Tyson First Dispute Letters, BOA did not correct the reporting. Instead, BOA verified and re-reported the inaccurate payment status, payment history, and bankruptcy notations via ACDV to Equifax and Experian.

136.    After receiving the Mr. Tyson Second Dispute Letters and Mrs. Tyson Second Dispute Letters, BOA deleted the tradelines on both of Plaintiffs' TransUnion reports. However, BOA did not correct the reporting on Mr. Tyson's Equifax or Experian reports or on Mrs. Tyson's Equifax or Experian reports. Instead, BOA verified and re-reported the inaccurate payment status, payment history, and bankruptcy notations via ACDV to Equifax and Experian.

137.    In the alternative, if BOA was unable to verify the accuracy of the information on Plaintiffs' account, the FCRA required BOA to then modify, block, or delete the tradeline which it did not do in its ACDV to Experian or Equifax.

138.    The account information reported in an AUD, monthly transmission, or ACDV represents the information of the account at the time of sending the AUD, monthly transmission, or ACDV, and is not a historical contractual item (i.e., monthly payment, highest balance, payment history, etc.). Therefore, even in the event the account was previously included in bankruptcy, it has no bearing on its *current* account information after the bankruptcy is dismissed without discharge.

139.    Once the account was fully satisfied, a subsequent bankruptcy discharge does not change the fact it was previously satisfied. Therefore, the account should reflect the final payment and satisfaction, and not the subsequent bankruptcy.

140.    BOA violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation, and re-reporting misleading and inaccurate account information.

141.    Experian, Equifax, and TransUnion all provided notice to BOA that Plaintiffs were disputing the inaccurate and misleading information; however, BOA either failed to conduct any investigation or failed to conduct a reasonable investigation as required by the FCRA.

142.    Based on Plaintiffs' numerous disputes, amounting to nine (9) in total, and review of its internal records on the account, BOA should have known its account was not discharged but instead was fully satisfied and transferred, and ceased its inaccurate reporting.

143.    Reporting a satisfied debt as if it was discharged in bankruptcy is patently incorrect.

144.    In addition, this incorrect reporting also adversely affects credit decisions. Discharged debts are far more injurious to a Credit Score than a satisfied debt. Payment history (including payment status), at thirty-five percent (35%), is the heaviest weighted factor that goes into calculating a FICO Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported Credit Score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, BOA's reporting as described herein has a direct adverse effect on Plaintiffs' respective Credit Scores and their ability to rebuild their respective Credit Scores and obtain new credit.

145.    The lack of investigation by BOA, as required by the FCRA, is unreasonable.

**B.    Willful Violations**

146.    Plaintiffs allege that BOA has reported based upon objectively unreasonable interpretations of the FCRA standards of credit reporting and regulatory guidelines on how to accurately report under the FCRA.

147.    Plaintiffs further allege that BOA has not properly trained those directly investigating disputes on FCRA requirements or credit reporting industry standards and, as such, have developed reckless policies and procedures.

148.     Plaintiffs allege that rather than train its employees on accurate credit reporting, FCRA requirements, and industry standards, BOA's employees tasked with reviewing disputes are expected to confirm the information being reported as "accurate" instead of investigating the reporting.

149.     In the alternative, BOA was negligent, which entitles Plaintiffs to recover under 15 U.S.C. § 1681o.

## C.     The CRA Defendants Each Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)

150.     Pursuant to 15 U.S.C. 1681i(a)(1), the CRA Defendants were each required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiffs' disputes regarding the BOA account.

151.     Thus, the CRA Defendants failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the accounts within the statutory time frame.

152.     The CRA Defendants are not passive entities bound to report whatever information a data furnisher provides.

153.     Plaintiffs allege the CRA Defendants are readily familiar with FCRA requirements and credit reporting industry standards.

154.     Based on the foregoing, Plaintiffs allege that the CRA Defendants can, and do, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

155.     The CRA Defendants can and do instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

156.     Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that BOA was not reporting its account at issue correctly.

157.     Had Equifax conducted a proper investigation, it could have removed the bankruptcy notations on the BOA debt, added the last six months of payment history (which was included with the dispute letters), and added a notation on the tradeline to show that the debt was in fact fully satisfied and transferred. However, Equifax continued to report the account as described herein.

158.     Experian failed to conduct a reasonable investigation because any basic investigation would have uncovered that BOA was not reporting its account at issue correctly.

159.    Had Experian conducted a proper investigation, it could have removed the bankruptcy notations on the BOA debt, added the last six months of payment history (which was included with the dispute letters), and added a notation on the tradeline to show that the debt was in fact fully satisfied and transferred. However, Experian continued to report the account as described herein.

160.    The CRA Defendants, therefore, did not conduct even the most basic investigation regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

**THIRD CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))**

**(Against Defendants and Does 1-100)**

161.    Plaintiffs re-allege and incorporate the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    The CRA Defendants Each Failed to Review and Consider all Relevant Information**

162.    The CRA Defendants each violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiffs.

163.    The CRA Defendants' violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiffs to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

164.    The CRA Defendants' violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

165.    In the alternative, the CRA Defendants were each negligent in failing to review and consider all relevant information Plaintiffs submitted, which entitles Plaintiffs to recovery under 15 U.S.C. § 1681o.

166.    Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorneys' fees from the CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

### FOURTH CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))

### (Against Defendants and Does 1-100)

167.    Plaintiffs re-allege and incorporate the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    The CRA Defendants Each Failed to Delete Disputed and Inaccurate Information**

168.    The CRA Defendants each violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiffs' respective credit files or modify the items of information upon a lawful reinvestigation.

169.    The CRA Defendants' violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiffs suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

170.    The CRA Defendants' violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

171.    In the alternative, the CRA Defendants were each negligent, which entitles Plaintiffs to recovery under 15 U.S.C. § 1681o.

172.    Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorneys' fees from the CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

### PRAYER FOR RELIEF

173.    WHEREFORE, Plaintiffs pray for judgment as follows:

    a.  For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

    b.  Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

    c.  Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

    d.  Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

    e.  For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq*.; and

    f.  For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: November 23, 2021                */s/ Kyle Schumacher*
Kyle Schumacher
Attorney for Plaintiff

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands trial of this matter by jury.


**SCHUMACHER LANE PLLC**

Dated: November 23, 2021

*/s/ Kyle Schumacher*
Kyle Schumacher
Attorney for Plaintiff